IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ARNDT V. MUNDT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MALLORY ARNDT, APPELLEE,

V.

JORDAN MUNDT, APPELLANT.

Filed April 15, 2025.   No. A-24-482.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Adam R. Little, of Nebraska Legal Group, for appellant.

James H. Hoppe for appellee.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Jordan Mundt appeals the order of the district court for Lancaster County awarding Mallory Arndt sole physical custody of the parties' minor children and ordering him to pay child support. He contends that the court should have ordered joint physical custody and that the amount of income attributed to him in the child support calculation was not supported by the evidence. Based on the reasons that follow, we affirm.

## BACKGROUND

Jordan and Mallory are the parents of twins, born February 2018. The parties have never been married but started living together in May 2018, when the children were a few months old. They continued to live together until May 2023, when Mallory moved out with the children.

- 1 -

Mallory filed a complaint to establish paternity, custody, and child support in May 2023. Jordan filed an answer and counterclaim seeking joint legal and physical custody. Trial was held in November 2023 and February 2024.

The evidence showed that when Mallory was pregnant, Jordan did not attend doctor visits and he was not at the hospital when the children were born. Before moving in with Jordan after the children were born, Mallory lived with her parents. She went back to work when the children were 8 weeks old and her mother, Christine Arndt, cared for the children while Mallory was at work. When Mallory moved in with Jordan, Christine continued to provide daycare for the children. When the children were around 6 months old, Jordan's mother started providing daycare 1 day per week and was still doing so at the time of trial.

The children were in kindergarten at the time of trial and Christine picked them up after school most days because Mallory was still at work.

Jordan suffered significant injuries from a car accident and had three surgeries during the time the parties lived together. The first surgery was a spinal fusion that took place in September 2019. He had been receiving medical care for his back for a year or two prior to the surgery, including lifting restrictions that began at the end of 2017. He continued to have lifting restrictions after his back surgery until May or June 2020 and was unable to drive for 3 months after the surgery.

In November 2021 and April 2022, Jordan had surgeries on his shoulder. Again, he had physical restrictions after the surgeries, including lifting restrictions and driving restrictions. He testified that he could not lift more than 5 pounds for 2 years.

Jordan's surgeries and restrictions limited his ability to care for the children during the time the parties lived together. He admitted he did not assist Mallory with the children's day-to-day care when they lived together because of his injuries and physical limitations after his surgeries. Mallory testified that after the children were born, Jordan could not hold them or carry them and could not bend down to bathe them because of his restrictions. She further testified that Jordan did not get up at night with the children.

Mallory testified that she did everything to get the children ready for daycare in the mornings. Jordan would be awake but watching television. If she asked him to do something he would, but he never offered to help. Mallory testified that Jordan did not do any cooking for the family, claiming he did not know how to cook. Jordan had also only been to one of the children's doctor appointments.

Mallory was the one who would drop off the children at daycare in the morning and pick them up after work. She testified that Jordan only took the children to daycare if he needed to use her car. Jordan testified that he could not drive for a period after each surgery, and when he could drive, he would often pick up the children from daycare on Fridays.

Jordan admitted that he consumed alcohol frequently during the time the parties lived together. He testified that he drank a lot after the surgeries because he was depressed from not being able to work. He would start drinking in the morning and drink all day, consuming between 6 and 15 beers daily. He would spend most of his time in his home office drinking beer and watching television, separated from Mallory and the children when they were home. Jordan did not believe his consumption of alcohol created any problems for him and did not impact his ability to parent.

Mallory testified that in the evenings when she and the children were home, Jordan would stay in his office except when he would go outside to smoke. Mallory would prepare dinner and Jordan would eat in his office. Mallory testified that Jordan never prepared an evening meal.

Jordan also smoked marijuana daily and claimed that Mallory did as well. He testified that Mallory would smoke marijuana in the morning before taking the children to daycare and going to work. Mallory admitted that she smoked marijuana sometimes in the evening with Jordan but denied that she smoked it in the morning.

Jordan testified that his drinking habits have changed since Mallory and the children moved out. He stated that he only drinks alcohol a couple times per week and does not drink at all when the children are with him. On the first day of trial, he testified that he continued to use a marijuana derivative that is legal in Nebraska. However, on the second date of trial a couple months later, he testified he had quit using all forms of marijuana. Jordan stated he would agree to the court imposing a provision in the parenting plan that prohibited him from drinking alcohol or consuming marijuana or any derivatives during his parenting time.

In late 2022 or early 2023, when Jordan was no longer disabled and the children were home with him, there were a couple times that Mallory had to leave work and go home to prepare lunch for the children because Jordan did not know what the children would eat or how to prepare it. During these times, Jordan was in his office while Mallory was preparing the children's lunch.

Mallory testified that she did not like Jordan driving with the children in the car because he was a reckless driver. She explained that he "loves to speed" and will yell at other drivers in traffic. She also stated that she had seen him on several occasions get out of his car and scream at other drivers who had done something to make him mad. Jordan denied this claim.

Mallory also testified that Jordan has a temper and is loud, aggressive, and terrifying when he is angry. She stated that Jordan told her about a physical fight he had with a friend where he broke the friend's jaw. He also told her he had killed someone. She testified that she stayed with him as long as she did because she was scared. However, he had never physically harmed her.

Jordan has a criminal background, including felony convictions. In 2013, he was convicted of flight to avoid arrest following a car accident in which he was under the influence of alcohol and methamphetamine at the time. In 2015, he was convicted of aggravated assault with a deadly weapon. Since 2015 he has only been charged with a couple minor misdemeanors and has not been incarcerated.

Jordan had been treated for drug dependency on two separate occasions in 2013, once for marijuana use and once for methamphetamine use.

At the time of trial, Jordan had a girlfriend, Jessica Nabarrete, whom he had been dating since June 2023. She lived on a farm in Burr, Nebraska, which is a 40 minute drive from Lincoln, where the parties live and the children go to school. Jordan had not moved in with Nabarrete, but he was spending a "significant amount of time" at her house. On the days Jordan had the children, the three of them would often stay at Nabarrete's house.

Nabarrete has sole physical custody of her four children and has a stepchild that lives with her half of the time. She testified that Jordan helps her cook and cooks for his children when he has them. She stated she has never seen Jordan smoke marijuana and has not seen him drunk, nor has she seen him drink and drive. She believed he is a safe parent.

After Mallory and the children moved out of Jordan's home, Jordan had the children every Sunday, Monday, and Tuesday. At the time of trial, he had them Friday, Saturday, and Sunday. Mallory's concerns for the children when they are in Jordan's care included that they sleep on a couch when they are at Nabarrete's house, and that they are dirty and had not bathed or brushed their teeth when they come back from Jordan's care. Jordan explained that the children are sometimes dirty when he returns them to Mallory because they often play outside until the time to leave for the exchange. He testified that the children brush their teeth twice a day and they sleep in beds when they are at his house. They also have beds at Nabarrete's house, but her children and the parties' children like to fall asleep on the couch watching movies on the weekends instead of sleeping in beds.

Due to Jordan's past felony convictions, he was prohibited from owning a firearm. Mallory testified that Jordan owned two guns that he kept in a tall glass-front cabinet. She stated that Jordan liked to go shooting out in the country with the one gun she described as a "World War II gun." She testified that she had fired the gun once or twice and had also purchased ammunition for the gun for Jordan. Mallory testified that Jordan obtained the second gun shortly before she moved out and she said it "look[ed] more like an AR-type gun" or a "semi-automatic type of gun." However, she also stated that she does not know much about types of guns. Mallory testified that Jordan also wanted to obtain a handgun and he had asked Mallory, as well as friends, to buy one for him. Jordan denied asking Mallory to buy him a firearm.

Jordan testified that the only guns that have ever been in the cabinet Mallory described were two BB guns. He testified that Mallory is lying about seeing firearms in the cabinet and lying that he asked her to buy ammunition. Nabarrete testified she had never seen any guns or ammunition in Jordan's home. Mallory admitted that she does not know what a BB gun looks like.

There was also evidence presented regarding Jordan's income from the past several years. Jordan worked as a self-employed painter doing primarily exterior painting. He testified that in 2021 and 2022 he had little income due to his two shoulder surgeries. In 2021, he earned about $5,000. His 2022 tax return had an adjusted gross income of $11,834.

He testified that 2023 was the first year since 2015 he was able to work full time. He stated that he earned approximately $1,000 per week, but the amount varied. Some weeks he earned more than $1,000, and other weeks he earned less than $1,000. Jordan was also asked if he remembered saying in his deposition that his earning potential was roughly $1,000 per week. He responded that it could be, but it varies depending on the painting job. He also testified that he had done almost $54,000 in contracts as of November 2023, or $38,000 after expenses were taken out.

Jordan later testified more specifically that as of November 14, 2023, he had 24 painting contracts for the year, totaling $54,980 in gross income, or $38,485 in net income. At the end of 2023, he started working at a gas station as a second job to have during the winter months and he was making $14 an hour.

Following trial, the district court entered an order establishing paternity, awarding the parties joint legal custody, and awarding Mallory sole physical custody, subject to Jordan's rights to parenting time under a court-ordered parenting plan. The court also entered a child support order, using $4,000 as Jordan's monthly gross income, requiring Jordan to make child support payments of $762 per month.

- 4 -

ASSIGNMENTS OF ERROR

Jordan assigns that the district court erred in (1) awarding Mallory sole physical custody, (2) failing to award the parties joint physical custody, and (3) calculating child support.

STANDARD OF REVIEW

In a paternity proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Shandera v. Schultz*, 23 Neb. App. 521, 876 N.W.2d 667 (2016). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

*Child Custody.*

Jordan assigns that the district court erred in awarding Mallory sole physical custody, rather than awarding the parties joint physical custody. He argues that the district court's custody decision was an abuse of discretion because it was not in the children's best interests.

When determining the best interests of the child in the context of custody, a court must consider, *at a minimum*, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024). Other relevant considerations include stability in the child's routine; minimalization of contact and conflict between the parents; the general nature and health of the individual child; the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Id.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id.* The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id.*

Jordan argues that the district court failed to conduct a best interests' analysis and that without any written findings, this court is left to draw assumptions about what the court did or did not consider in reaching its decision.

We agree that the court's order did not provide any analysis regarding the children's best interests. The only factual finding regarding best interests was that the court found both parties were fit and proper parents. This court has recognized that although the district court is not necessarily obligated to provide a detailed analysis in a modification of custody case, it is the best practice for a district court to provide some detailed analysis in determining what is in the best

interests of the children. See *Janda v. Janda, supra*. Although *Janda* was a modification of custody case, the same practice is encouraged for a district court in an initial determination of custody case.

The absence of a best interest analysis is not dispositive, however, because the Nebraska Supreme Court has recognized that even when a finding is not expressly made by a trial court, an appellate court, in its de novo review, may make such a finding if the evidence supports it. See, *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020); *Janda v. Janda, supra*. However, where the district court does not provide an analysis, an appellate court can make little application of the general rule that in a de novo review, an appellate court considers and may give weight to the fact that the trial court saw and heard the witnesses. See *Janda v. Janda, supra*.

Without a best interests analysis from the district court, we must conduct a best interests analysis de novo on the record before us. We first note that there was much focus on Jordan's criminal past, but his crimes were committed before the children were born and he had not had any significant criminal history since then.

There was also much testimony regarding Jordan's ownership of firearms. Based on his past felony convictions, he was prohibited from owning any firearms. Jordan disputed Mallory's testimony that he owned two guns and that she had purchased ammunition for one of the guns. Mallory also testified that Jordan liked to go shooting out in the country with the "World War II gun" and that she had fired it once or twice. Jordan testified that any guns Mallory saw were BB guns, which he contends are not prohibited firearms. Regardless of whether Jordan does or does not own firearms, the issue is not determinative of the children's best interests and other factors weigh more heavily in our analysis.

After Mallory and the children moved out, Jordan had been having parenting time 3 days per week. Mallory did not have any significant concerns about Jordan's parenting time with the children. Her only concerns were that the children were often dirty when they came back to her house, she claimed the children did not brush their teeth when they were with Jordan, and that they slept on a couch when staying at Nabarrete's house. Jordan explained why the children were sometimes dirty and sometimes slept on the couch at Nabarrete's house. He also testified that the children brushed their teeth twice daily at his house.

The evidence that we find most relevant as to best interests is the evidence regarding Jordan's relationship with the children prior to the commencement of this action. Jordan lived in the same household with the children and Mallory for 5 years beginning when the children were only a few months old. Jordan's daily involvement in providing parental care during those 5 years was very limited and nearly nonexistent. Mallory was almost entirely responsible for the children's day-to-day care. We acknowledge that during much of the 5 years there were many parental tasks Jordan could not do because of his physical restrictions. Mallory testified that after the children were born, Jordan could not hold them or carry them and could not bend down to bathe them because of his restrictions. However, Jordan's mobility was not completely restricted.

There was evidence that he did not get up with the children at night, he did not feed the children, and attended only one medical appointment. He never prepared an evening meal for the family, despite being home all day, and never helped Mallory cook. Mallory got the children ready in the morning for daycare, and although Jordan would be awake, he did not help unless Mallory asked him to do something. Mallory was also the one who took the children to daycare and picked them up after work. Even when Jordan could drive, he did not take the children to and from

daycare, unless he needed Mallory's car for the day. There was no evidence that he interacted with or played with the children when they were home in the evenings. Mallory also testified that she would bring dinner to Jordan in his office and he would eat it in there. Jordan spent most of his time isolated in a room away from the children, drinking beer and watching television, except for going outside to smoke. He also consumed marijuana daily. This behavior continued from the time she and the children moved in with Jordan until they moved out.

Even after Jordan had recovered from his surgeries and had the children at home, there were several occasions where Mallory had to leave work to fix lunch for the children because Jordan did not know what the children would eat or how to prepare it. Jordan was in his office while Mallory was preparing lunch.

Clearly, Mallory has been the children's primary caregiver since they were born. Jordan has played a limited role in their day-to-day care. We understand that his inability to do some parenting tasks was limited by his mobility at times, but during the 5 years he lived with his children he was drinking daily and isolating himself in his office rather than interacting with and helping parent his children.

In addition, during the 5 years the parties lived together, they had to rely on Mallory's income due to Jordan's surgeries and subsequent recoveries, and they struggled financially. They lived in a townhouse owned by Jordan's parents and despite an agreement to pay rent, they only paid rent for 1 month. Mallory's mother bought most of the children's clothing and the diapers she used when she was providing care for them. Despite their financial struggles, Jordan spent an average of $350 per month, and at times up to $600 per month, at the gas station near their home buying beer, cigarettes, and snacks. He chose to spend Mallory's earnings on nonessential items for himself, rather than on necessities for the children, indicating his failure to put his children's needs ahead of his own.

After our de novo review of the record in this case, we cannot say the district court abused its discretion in finding that it was in the children's best interests to award Mallory sole physical custody and Jordan parenting time as set forth in the court's order. Jordan's first two assignments of error fail.

*Child Support.*

Jordan next assigns that the district court erred in calculating child support. Specifically, he argues there is no evidence in the record to support the court's determination that Jordan was earning a gross income of $4,000 per month, or $48,000 per year.

Jordan testified that 2023 was the first year since 2015 that he was able to work full time. He stated that he earned approximately $1,000 per week, but the amount varied. Some weeks he earned more than $1,000, and other weeks he earned less than $1,000. Jordan was also asked if he remembered stating in his deposition that his earning potential was roughly $1,000 per week. He responded that it could be, but it varies depending on the painting job. Jordan also testified that as of November 14, 2023, he had earned $54,980 in gross income.

In addition, a portion of Jordan's deposition was entered into evidence, attached to Mallory's proposed child support worksheet. There was no objection to its admission into evidence. During his deposition, Jordan was asked what he considers his weekly pay to be and he stated, "It would usually be probably 15; maybe 11 to $1,500. . . ." He was then asked if his income

after the payment of expenses was $1,500 per week and he responded, "I was going to say 15. No. Probably closer to $1,000."

Accordingly, the evidence supported a finding that Jordan was earning $1,000 per week or $4,000 per month. There was also evidence that he earned at least $54,980 in gross income in 2023, which equates to $4,580 per month gross income. After our de novo review, we conclude there is evidence in the record to support the court's determination that Jordan's monthly gross income was $4,000 per month. The district court did not abuse its discretion in using this amount of income when calculating child support. This assignment of error fails.

CONCLUSION

We conclude the district court did not abuse its discretion in awarding Mallory sole physical custody, subject to Jordan's parenting time, or in its child support calculation. The district court's order is affirmed.

AFFIRMED.